NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| Richard SZELC, | |
| Plaintiff, | Civil No. 08-4782 (AET) |
| v. | **OPINION & ORDER** |
| David STANGER individually and t/a WESTMARQ PROPERTY GROUP, LLC, PARKSTONE ACQUISITION, LLC, ACQES LLC, WESTMARQ LLC a/k/a WESTMARQ FINANCIAL, WESTMARQ FUND MANAGEMENT LLC, David STONE a/k/a David STANGER, Gabor GOTTESMAN a/k/a Gabir GOTTESMAN, GMAC MORTGAGE, LLC a/k/a GMAC MORTGAGE CORPORATION, MADISON TITLE AGENCY, LLC a/k/a MADISON AGENCY, et al., | |
| Defendants. | |

THOMPSON, U.S.D.J.

## I.   INTRODUCTION

    This matter has come before the Court upon the Motions for Summary Judgment filed by

Defendants David Stanger, Westmarq Property Group, LLC, Parkstone Acquisition, LLC, Acqes,

LLC, Westmarq LLC, Westmarq Fund Management LLC, David Stone, and Gabor Gottesman

(collectively, "Stanger Defendants"); Defendant GMAC Mortgage, LLC ("GMAC"); and

Defendant Madison Title Agency ("Madison") [docket # 111, 112, 113].  The Court has decided

the motions upon the submissions of the parties and without oral argument, pursuant to Fed. R.

Civ. P. 78(b).  For the reasons stated below, the Defendants' motions are granted in part and

denied in part.

## II. BACKGROUND

This case involves a sale-leaseback agreement entered into by Plaintiff's wife and a company owned by Defendants David Stanger and Gabor Gottesman.  Plaintiff now claims that this transaction was a sham designed to strip the equity from his property and executed without his knowledge or consent.  He therefore seeks to have the property restored to his ownership and requests damages for various other conspiracy, fraud, fiduciary duty, and unjust enrichment claims.

### A.  The Property, Previous Mortgages and Foreclosure

Plaintiff Richard Szelc and his wife Teresa Szelc (the "Szelcs") owned a residence in Manahawkin, New Jersey (the "Property"), to which they had acquired title as Surviving Joint Tenants upon the death of Plaintiff's grandparents.   (Pl.'s Statement of Undisputed Material Facts ("SUMF") ¶ 2) [116-1].  According to appraisals during the relevant period, the Property was worth roughly $510,000.  (Pl.'s SUMF ¶ 70); (Edward J. Kelleher, Esq., Certification Ex. NN) [116-6].  In September 2002, the Szelcs borrowed $160,190, secured by a First Mortgage on the Property.  (GMAC SUMF ¶ 3) [112-26]; (Stephen McNally, Esq., Certification Ex. B, C) [112-3].  In May 2003, the Szelcs opened a $25,000.00 line of credit, secured by a Second Mortgage on the Property.  (GMAC SUMF ¶ 5); (McNally Certification Ex. E).

Foreclosure actions were commenced on the mortgages in 2005 and again in 2006 due to the Szelcs' failure to make payments, (GMAC SUMF ¶¶ 6, 10, 11), and the Property was ultimately sold in a sheriff's sale on January 29, 2008, for $254,000.  (Pl.'s SUMF ¶ 17.)  On the day of the foreclosure sale, Plaintiff's wife was visited at home by Nachman Taub, an employee of Westmarq Property Group, to discuss the possibility of selling the Property to avoid the foreclosure.  (GMAC SUMF ¶ 24–25.)  Under New Jersey law, a mortgagor may exercise the right to redeem a property within ten days of a foreclosure sale—in this case, by February 8,

2008.  *See* N.J. Ct. R. 4:65-5; *Hardyston Nat'l Bank v. Tartamulla*, 267 A.2d 495, 497–98 (N.J. 1970).  Mrs. Szelc subsequently called David Stanger, the principal of Westmarq Property Group, to further discuss the details of an arrangement whereby Stanger's company would pay off the mortgages to redeem the Property, the Property would be transferred to an affiliated entity, and the Szelcs would remain on the Property as renters with the option to repurchase or otherwise have the Property sold off for profit.  (GMAC SUMF ¶ 30.)

### B.  The Sale-Leaseback Transaction

Stanger prepared a contract of sale containing the option agreement and the lease terms. (Stanger SUMF ¶ 16) [113-3].  Stanger arranged for Madison Title Agency, LLC ("Madison"), to prepare closing documents including a deed, an affidavit of title, and an HUD closing statement. (*Id.* ¶ 15.)  Mrs. Szelc had stated that her husband, the Plaintiff, was a commercial crab-fisherman whose schedule did not permit him to be involved in the closing of the transaction.  (Stanger SUMF ¶ 12) [111-38].  Accordingly, Stanger also arranged for Madison to prepare a Power of Attorney from Plaintiff to Mrs. Szelc.  (*Id.* ¶ 15.)

On February 7, 2008, Mrs. Szelc took all of these documents—apparently signed by Plaintiff—to a notary, Betty Mulch.  (Madison SUMF ¶ 35–36) [113-3].  Although Mulch did not witness Plaintiff sign the documents, she notarized them based upon Mrs. Szelc's representations that Plaintiff had signed the documents and that he could not appear in person because he was busy working on his fishing boat.[1]  (*Id.* ¶ 37–46.)  However, Plaintiff states that he did not actually sign any of the documents and that his signature was forged.  (Pl.'s SUMF ¶ 38, 42).  The Defendants suggest that Plaintiff's signature most likely was forged by his wife, Teresa Szelc.[2]

---

[1] According to Plaintiff's deposition, he was not fishing and was actually doing flooring work in a neighbor's home. (McNally Certification Ex. D, Richard Szelc Dep. 179:22-183:6.)
[2] Mrs. Szelc was not named as a defendant in Plaintiff's Complaint; she has been sued as a third-party defendant by the Stanger Defendants, GMAC, and Madison.  [*See* docket # 84, 85, 86].  Because Mrs. Szelc evoked the Fifth Amendment privilege against self-incrimination in response to nearly every question at her deposition, (*see* Brian M. Thorn Certification Ex. M) [113-11], there is no direct evidence that she forged Plaintiff's signature.

(Stanger SUMF ¶ 27); (GMAC Br. in Supp. of Mot. for Summ. J. 20); (Madison Mem. in Supp. of Summ. J. 36).

On February 8th, Mrs. Szelc met Stanger and a Madison representative at the Sheriff's office to deliver the signed and notarized closing documents.  (Stanger SUMF ¶ 20–21.)  The Deed transferred ownership from the Szelcs to Parkstone Acquisition, LLC ("Parkstone")—a New Jersey company of which Stanger and Gabor Gottesman are the sole members—for the amount of $260,497.65.  (Madison SUMF ¶ 48.)  The sale amount, paid out of pocket by Gottesman, went to the Sheriff's office in order to pay off the First and Second Mortgages,[3] thereby cancelling the foreclosure.  (Stanger SUMF ¶ 20.)

The "Contract of Sale – With Lease and Option to Purchase" provided that the Szelcs would remain in possession and would owe, in accordance with the Lease, a monthly rent of $2000.00 plus utilities (Fred R. Gruen Aff. Ex. 16) [111-20].  The contract further provided that the Szelcs would have the option to purchase the Property at a price equal to the sum of the following: (i) the option price of $300,497.65, open through February 7, 2009; (ii) the annual rent price of $24,000.00, as due under the lease for the entire one-year term; (iii) taxes paid during Parkstone's ownership, (iv) homeowner's insurance; (v) all closing costs incurred upon transfer of title; and (vi) reimbursement for any repairs advanced by Parkstone.  (*Id.*)  Finally, the contract provided that the Szelcs could request at any time during the option period that the property be sold and thereby collect on any proceeds above the option price after the deduction of closing costs.[4]  (*Id.*)

### C.  Transfer of Property to Gottesman and New Mortgage

On February 26, 2008, Parkstone transferred title to the Property over to Gottesman for

---

[3] Specifically, the Settlement Statement indicates that the First Mortgage was paid off for $215,429.37 and the Second Mortgage was paid off for $34,575.01. (McNally Certification Ex. CC.)
[4] Closing costs include, but are not limited to, the following: legal fees, realty transfer tax, realtor commissions, and the cost of government documents and repair credits or concessions.  (Fred R. Gruen Aff. Ex. 16)

consideration of $1.00.  (Kelleher Certification Ex. BB) [116-5].  Prior to the recording of the

Parkstone-Gottesman Deed, Plaintiff's counsel contacted Stanger and Parkstone to advise them

that Plaintiff had not signed the original Szelc-Parkstone deed and that his signature was not valid.

(Pl.'s SUMF ¶ 57.)  On February 29th, Stanger emailed Pessy Herman at Madison, stating,

"[P]lease do not record the transfer into [sic] Sam Gottesman, something came up that I will need

to address."  (Kelleher Certification Ex. GG.)  However, Stanger did not explicitly note in the

email any issue regarding Plaintiff's signature and, on March 5th, Stanger authorized Herman to

record the transfer.  (Pl.'s SUMF ¶ 61.)

        Subsequently, on March 19th, Gottesman obtained a loan from First Meridian Mortgage

("First Meridian") in the amount of $277,000.00, secured by a mortgage on the Property, (Pl.'s

SUMF ¶ 54); (Kelleher Certification Ex. DD).  First Meridian later assigned this mortgage to

GMAC Mortgage Corporation ("GMAC").  (GMAC SUMF ¶ 40) [112-26].  The loan documents

that First Meridian handed over to GMAC did not provide notice of any forgery or other claims

that Plaintiff now makes.  (Jean Aguirre Certification ¶ 4) [112-1].

        Plaintiff later personally contacted Madison on April 9, 2008, to advise the agency that he

disputed the original Szelc-Parkstone transfer.  (Madison SUMF ¶ 57.)

        **D.  Initial Action and Motion for Summary Judgment**

        Plaintiff filed a Complaint on September 25, 2008 [1], an Amended Complaint on

November 5, 2008 [15], and finally a Second Amended Complaint on August 13, 2009 [56].  The

Second Amended Complaint brings claims against Defendants Stanger, Westmarq Property

Group, LLC ("WPG"), Parkstone Acquisition, LLC ("Parkstone"), Acqes LLC ("Acqes"),

Westmarq LLC ("WM"), Westmarq Fund Management LLC ("WFM"), Gottesman, David Stone

a/k/a/ David Stanger (collectively, the "Stanger Defendants"), as well as GMAC and Madison.[5]

_____

[5] The Second Amended Complaint also names as defendants Betty J. Mulch, Mortgage Electronic Registration

In the Second Amended Complaint, Plaintiff includes fifteen counts, alleging federal RICO violations, New Jersey RICO violations, violation of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601, *et seq.*, violation of the Home Ownership and Equity Protection Act ("HOEPA"), 15 U.S.C. § 1639, breach of fiduciary duty, violation of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692(a)(6), violation of the Consumer Fraud Act ("CFA"), N.J.S.A 56:8-1 *et seq.*, civil conspiracy, aiding and abetting, unjust enrichment, unconscionability, negligence, and fraudulent transfer.

The Stanger Defendants, GMAC, and Madison now move for Summary Judgment.  [111, 112, 113].

## III. ANALYSIS

**A.  Legal Standard for Summary Judgment**

Summary judgment is appropriate if the record shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In deciding whether summary judgment should be granted, a district court considers the facts drawn from "the pleadings, the discovery and disclosure materials, and any affidavits" and must "view the inferences to be drawn from the underlying facts in the light most favorable to the party opposing the motion."  Fed. R. Civ. P. 56(c); *Curley v. Klem*, 298 F.3d 271, 276–77 (3d Cir. 2002) (internal quotations omitted). In resolving a motion for summary judgment, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 251–52

---

System, Inc., STR investment LLC, Hindy R. Stanger a/k/a Rachel Stanger, John Does 1–20, and XYZ Companies 1–20, although these parties are not part of the present Motion for Summary Judgment.  (Second Am. Compl. 1.)

(1986). Specifically, summary judgment should be granted if the evidence available would not support a jury verdict in favor of the nonmoving party. *Id.* at 248–49.

### B. Summary Judgment as to Stanger Defendants

The Stanger Defendants' request for summary judgment consists of three main arguments: (1) none of the disclosure statutes apply because the forgery of Plaintiff's signature rendered the transaction void *ab initio*; (2) they are not creditors subject to the disclosure statutes because the sale-leaseback transaction was a sale and not a loan; and (3) the common law claims must fail as a matter of law. We address these arguments in turn.

### 1. Effect of Forgery

The Stanger Defendants argue that because forgery renders the transaction at issue "void ab initio, the Stanger Defendants per force cannot have violated any disclosure statutes controlling enforceable loan transactions." (Stanger Br. in Supp. 21 (emphasis in original)) [111].

It appears well-established that the effect of a forgery is that the forged document is null and void. *See, e.g.*, *In re Galtieri*, 2007 WL 2416425, at *6 (Bankr. D.N.J.) (declaring deed null and void as a result of forgery); Roger A. Cunningham, William B. Stoebuck & Dale A. Whitman, *The Law of Property*, § 11.9 at 782 (1984) ("A recorded deed, for example, may be a forgery, procured by fraud in the execution, executed by a minor, or never delivered. Any one of these defects will make the deed void, and the fact that it is recorded in no sense enhances its validity"); *Brewster v. Entz*, 86 N.J. Eq. 242, 242 (Err. & App. 1916) (per curiam) ("As the point of the opinion is that the assignment was a forgery, the language of the decree itself is correct in adjudging that the assignment is null and void."); *Angle v. North-Western Mut. Life Ins. Co.*, 92 U.S. 330, 338 (1875) ("[Complainant] contends that the said alterations made in the instrument were a forgery, which renders the completed instrument void; and the court here concurs in that proposition.")

Here, the Defendants assert that Plaintiff's signature was forged.  If this is true, the sale-leaseback transaction may ultimately be set aside as void.  However, there are two problems with granting summary judgment on forgery grounds in this case.  First, a genuine issue of material fact remains as to whether Plaintiff's signature truly was forged or whether he is simply attempting to evade a transaction that turned out to be unfavorable to his interests.  (*See, e.g.*, GMAC Br. in Supp. 19.)

Second, even if we assume Plaintiff's signature was forged, Defendants have not cited any case law for the proposition that transactional defects exempt them from the obligation to follow disclosure requirements.[6]  Absent any case law on point, we fail to see policy reasons in favor of such a rule.  The disclosure requirements applicable to loans under TILA and HOEPA attach prior to completion of the transaction.  *See* 15 U.S.C. § 1639 ("The disclosures required by [HOEPA] shall be given not less than 3 business days prior to consummation of the transaction."); *cf.* 15 U.S.C. § 1601(a) (stating that TILA's purpose is "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit").  Creditors must order their conduct leading up to the transaction according to TILA and HOEPA on the assumption that the transaction will be validly executed; the policies of these disclosure statutes would not be served by ignoring non-compliance simply because defects render the transaction void.  Furthermore, CFA broadly prohibits fraudulent practices "in connection with the sale or advertisement of any merchandise or real estate," and simply requires "(1) unlawful conduct by defendant; (2) an ascertainable loss by plaintiff; and (3) a causal relationship between the unlawful conduct and the ascertainable loss." *Bonnieview Homeowners Ass'n v. Woodmont Builders*, 655 F. Supp. 2d 473, 503 (D.N.J. 2010) (quoting *Bosland v. Warnock Dodge, Inc.*, 964 A.2d 741, 749 (N.J. 2009).  A valid transaction is

---

[6]   Of course, whether disclosure requirements apply depends on whether the transaction was tantamount to a loan, a question which we address further below.

not required and, as such, the Plaintiff may be able to show an ascertainable loss arising from the Defendants' conduct even if the transfer of the Property is set aside as void.

Accordingly, we cannot conclude at the summary judgment stage that forgery exempts a defendant from disclosure obligations under TILA, HOEPA or CFA absent any support for such a rule.

### 2.   Characterization of Sale-Leaseback Transaction

Plaintiff alleges that the transaction entered into by his wife and the Stanger Defendants was "a disguised or equitable mortgage," and therefore is subject to the disclosure requirements of various statutes such as TILA, HOEPA, and CFA.  (Second Am. Compl. ¶ 129).  The Stanger Defendants assert that the sale-leaseback transaction constituted a sale, not a loan, and accordingly is not subject to those statutes as a matter of law.  (Stanger Br. in Supp. 22–33) [111].

Another judge in this district recently adopted a functional test for determining that a sale-leaseback should instead be treated as an equitable mortgage, based on the following factors:

> (1) Statements by the homeowner or representations by the purchaser indicating an intention that the homeowner continue ownership; (2) A substantial disparity between the value received by the homeowner and the actual value of the property; (3) Existence of an option to repurchase; (4) The homeowner's continued possession of the property; (5) The homeowner's continuing duty to bear ownership responsibilities, such as paying real estate taxes or performing property maintenance; (6) Disparity in bargaining power and sophistication, including the homeowner's lack of representation by counsel; (7) Evidence showing an irregular purchase process, including the fact that the property was not listed for sale or that the parties did not conduct an appraisal or investigate title; and (8) Financial distress of the homeowner, including the imminence of foreclosure and prior unsuccessful attempts to obtain loans.

*Johnson v. Novastar Mortg., Inc.*, 698 F. Supp. 2d 463, 469–70 (D.N.J. 2010) (citing *In re O'Brien*, 423 B.R. 477, 489–92 (Bankr. D.N.J. 2010)).

Applying those factors to the case at bar, we cannot conclude as a matter of law that the sale-leaseback should be considered a sale rather than an equitable mortgage.  As to the first factor, the purpose of the transaction was to allow the Szelcs to remain on the Property and

potentially secure additional financing.  As to the second factor, there was a substantial disparity

between the value for which the mortgages were paid off ($250,004.38) and the actual value of

the Property based on the appraisal ($510,000.00).  As to the third factor, the sale contract

specifically contained an option to repurchase.  As to the fourth factor, the Szelcs remained in

possession of the house.  As to the fifth factor, because the option price included reimbursement

of taxes and repairs advanced, it appears that Parkstone was responsible for paying real estate

taxes and maintenance costs until the Szelc's repurchase.  As to the sixth factor, Mrs. Szelc was

not represented by counsel, and it is unlikely that Mrs. Szelc was nearly as sophisticated regarding

real estate transactions as the Defendants.  As to the seventh factor, the Property was sold in a

sheriff's sale, and the Property was appraised.  As to the eighth factor, the Szelcs likely were in

financial distress given that foreclosure had been completed; however, nothing in evidence shows

that the Szelcs engaged in prior unsuccessful attempts to obtain loans.  In short, all but the fifth,

seventh, and eighth factors laid out in *Novastar* appear to point in favor of finding an equitable

mortgage.

        In light of these factors, we cannot conclude as a matter of law that the sale-leaseback was

merely a sale.  Because the Stanger Defendants' motion for summary judgment as to the federal

RICO (Count I), New Jersey RICO (Count II), TILA (Count III), HOEPA (Count IV), FDCPA

(Count VI), and CFA (Count VII) claims is premised upon their argument that the sale-leaseback

transaction was not a loan, summary judgment is denied with respect to these claims.

### 3.  Common Law Claims

        Plaintiff brings common law claims for breach of fiduciary duty, unjust enrichment,

unconscionability, negligence and fraudulent transfer.  The Stanger Defendants concede that the

Parkstone-Gottesman transfer would be fraudulent under N.J.S.A. 25:3-21, (*see* Stanger Br. in

Supp. 18) [111], and thus we do not consider the summary judgment motion with respect to the

fraudulent transfer claim.  We proceed to address the Stanger Defendants' arguments for summary judgment on the other common law claims.

### a.  Breach of Fiduciary Duty (Count V)

Plaintiff alleges that the Stanger Defendants assumed a fiduciary duty to Plaintiff and breached that duty by not discussing "which measures to take . . . in addressing the foreclosure," in "completing certain transactions involving the Subject Property," and by "divest[ing] Plaintiff's equity in his home . . . ."  (Second Am. Compl. ¶ 146–48.)  The Stanger Defendants argue that there was no fiduciary relationship and that, even if there was, they did not breach their duty.  (Stanger Br. in Supp. 37, 39.)  We agree.

The New Jersey Supreme Court has defined a fiduciary relationship as existing where "one party places trust and confidence in another who is in a dominant or superior position" and "when one person is under a duty to act for or give advice for the benefit of another on matters within the scope of their relationship."  *McKelvey v. Pierce*, 800 A.2d 840, 859–60 (N.J. 2002) (quoting *F.G. v. MacDonell*, 696 A.2d 697, 703–04 (N.J. 1997)).  Moreover, "creditor-debtor relationships rarely give rise to a fiduciary duty inasmuch as their respective positions are essentially adversarial."  *N.J. Econ. Dev. Auth. v. Pavonia Rest., Inc.*, 725 A.2d 1133, 1139 (N.J. Ct. App. Div. 1998) (internal quotations omitted).

Plaintiff contends in his brief that the Stanger Defendants held themselves out on their website as experts having done extensive research in the field, and that they charged $4,500 for their services as reflected on the HUD statement.  (Pl.'s Br. in Opp'n 41 (citing Pl.'s SUMF ¶¶ 34, 46–51)) [116].  The Defendants' expertise does not automatically create a fiduciary relationship with every homeowner that enters into a transaction with them.  Plaintiff needs to show that the Defendants were in a dominant position, and that he placed trust and confidence in them.  However, Plaintiff himself could not have been the one who placed trust and confidence in the

Defendants, given that he never interacted with the Defendants until after the sale-leaseback transaction was completed.  Accordingly, summary judgment is granted in favor of the Stanger Defendants on the fiduciary breach claim.

### b.  Unjust Enrichment (Count IX)

Plaintiff alleges that the Stanger Defendants were unjustly enriched insofar as each "received ownership of and/or a portion of the value of the equity in the Subject Property." (Second Am. Compl. ¶ 164.)  Plaintiff further alleges that the unjust enrichment "includes the mortgage on the Subject Property . . . ."  (*Id.* ¶ 165.)  Plaintiff also asserts that the Stanger Defendants were unjustly enriched to the extent each Defendant "received payment and/or compensation relating to the Subject Property."  (*Id.* ¶ 166.)  In his brief, Plaintiff describes this claim as arising out of the Defendants' collection of monthly rent payments from Plaintiff.  (Pl.'s Br. in Opp'n 42) [116].

Unjust enrichment is an equitable remedy a court may apply where a defendant has received a benefit and retention of that benefit without payment to the plaintiff would be unjust. *VRG Corp. v. GKN Realty Corp.*, 641 A.2d 519, 526 (N.J. 1994); *see also DiCarlo v. St. Mary Hosp.*, 530 F.3d 255, 268 (3d Cir. 2008) (quotation and citation omitted).

As stated above, material issues of fact remain as to whether Plaintiff's signature was actually forged.  If the sale-leaseback transaction was void, then the Stanger Defendants may have been unjustly enriched to the extent of any benefit they received based on the void contract. Accordingly, summary judgment must be denied as to the unjust enrichment claim.

### c.  Unconscionability (Count X)

Plaintiff alleges that the Stanger Defendants had "an enormous amount of bargaining power" and that the "terms of the subject transaction are so one-sided as to be abusive and unconscionable." (Second Am. Compl. ¶ 168–70.)  Plaintiff further claims that the Stanger

Defendants "exploited the disparity in bargaining power to, among other things, induce a transfer of title to the Subject Property." (*Id.* ¶ 171.)

Under New Jersey law, a plaintiff must demonstrate both procedural unconscionability in the formation of the contract and substantive unconscionability as to the disproportionate contract terms. *Sitogum Holdings, Inc. v. Ropes*, 800 A.2d 915, 920 (N.J. Super. Ct. Ch. Div. 2002). Substantive unconscionability requires the terms to be "so one-sided as to shock the court's conscience." *Id.* Procedural unconscionability includes "a variety of inadequacies, such as age, literacy, lack of sophistication, hidden or unduly complex contract terms, bargaining tactics, and the particular setting existing during the contract formation process." *Id.*

Regarding substantive unconscionability, the Szelcs' house was purchased for $267,497.65, but had an appraisal value of $510,000. In *Howard v. Diolosa*—a case similarly involving a sale-leaseback transaction—the court found unconscionability because, in addition to a markedly low price of $25,000 for a house worth $150,000 to $200,000, the transaction was the result of disproportionate bargaining power. 574 A.2d 995, 1000 (N.J. Super. Ct. App. Div. 1990). Although the disparity in this case is not as significant as that in *Diolosa*, we could not conclude as a matter of law that this price was not substantively unconscionable. However, the unconscionability claim must be dismissed because Plaintiff has failed to produce any evidence of procedural unconscionability. Specifically, because Mrs. Szelc has evoked the Fifth Amendment, there is no evidence on which we could conclude that the bargaining process was procedurally unconscionable. Absent any showing of procedural unconscionability, this claim cannot proceed.

Thus, we will grant summary judgment as to the unconscionability claim.

### d. Negligence (Count XII)

Plaintiff alleges that the Stanger Defendants breached their duties to Plaintiff by failing to exercise due care in drafting, reviewing, and processing the paperwork for the Szelc-Parkstone

transaction.  (Second Am. Compl. ¶ 184.)  The Stanger Defendants argue that they had no duty to

ensure that Plaintiff signed the relevant documentation, particularly given their reliance on the

notarization of Plaintiff's signatures on the Power of Attorney and the Deed.  (Stanger Br. in

Reply 12.)  We agree with the Defendants.  There are no New Jersey cases stating that a buyer

entering into a contract owes a duty to the seller to ensure that the seller has properly executed the

contract.[7]  While some decisions have subjected banks to commercial standards of care for

recognizing forgeries on checks, *see, e.g.*, *N.J. Steel Corp. v. Warburton*, 655 A.2d 1382, 1386–87

(N.J. 1995) (citation omitted), those cases are not analogous to the present situation.  Plaintiff's

signature was notarized, so absent any evidence that the Defendants knew the notary had

improperly acknowledged the signatures, there is no genuine issue of material fact as to whether

the Defendants were negligent in accepting the Power of Attorney and the Deed.  Accordingly, we

must grant summary judgment for the Stanger Defendants on the negligence claim.

### C.  Summary Judgment as to Defendant Madison

Plaintiff includes Defendant Madison in its Second Amended Complaint solely with

respect to its federal RICO, NJ RICO, fiduciary breach, civil conspiracy, aiding and abetting,

CFA, unjust enrichment, unconscionability, and negligence claims.  We address these claims in

turn.

### 1.  Federal RICO (Count I)

Plaintiff alleges that Madison participated in the collection of an unlawful debt and

engaged in a pattern of racketeering in violation of the federal RICO statute.  (*See* Second Am.

Compl. ¶ 104–15.)  Madison argues that there is no evidence that it participated in the "operation

or management" of the Stanger enterprise.  (Madison Br. in Supp. 12–13) [113].  We agree with

Defendant Madison.

---

[7]   A Louisiana jury found negligence where a bank failed to verify a co-signer's signature on loan documents, *see Ford Motor Credit Co. v. Dunham*, 2009 WL 4981913, at *5 (La. Ct. App. Dec. 23, 2009), but notably the court there found that the bank might have avoided liability by requiring notarization of the signature.

To state a civil claim for a RICO violation under 18 U.S.C. § 1962(c), a plaintiff must show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 496 (1985). The "conduct" element requires a defendant to have participated in the "operation or management" of the affairs of the enterprise. *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993). "Under this test, not even action involving some degree of decisionmaking constitutes participation in the affairs of an enterprise." *Univ. of Md. at Baltimore v. Peat, Marwick, Main & Co.*, 996 F.2d 1534, 1538–39 (3d Cir. 1993). In applying this test, the Third Circuit has refused to hold an accounting firm liable under RICO for its performance of generic financial services for an insurance company. *Id.*

Even construing the facts in Plaintiff's favor, Madison would not meet the "operation or management" test. Madison acted as the title agent for the sale-leaseback transaction. Plaintiff argues that Madison enabled the Stanger Defendants to carry out the transaction by providing paperwork such as the Power of Attorney and by revising the title history on the deed. (Pl.'s Br. in Opp'n 36–37) [116]. However, these actions would not rise to the level of "operation or management." Thus, we will grant summary judgment in favor of Defendant Madison on the federal RICO claim.

### 2. New Jersey RICO (Count II)

Plaintiff also alleges that Madison participated in the collection of an unlawful debt and engaged in a pattern of racketeering in violation of the New Jersey RICO statute. (*See* Second Am. Compl. ¶ 116–27.) Madison argues that there is no evidence that it had the requisite intent to participate in the furtherance of an illegal enterprise. (Madison Br. in Supp. 15) [113].

To prove a violation of N.J.S.A. 2c:41-2(c), a plaintiff must establish: "(1) the existence of an enterprise; (2) that the enterprise engaged in or its activities affected trade or commerce; (3) that defendant was employed by, or associated with the enterprise; (4) that he or she participated

in the affairs of the enterprise; and (5) that he or she participated through a pattern of racketeering activity." *State v. Ball*, 632 A.2d 1222, 1235 (N.J. Super. Ct. App. Div. 1993).  Unlike the federal RICO statute, NJ RICO does not require "operation or management," and instead participation is defined as acting "purposefully and knowingly in the affairs of the enterprise in the sense of engaging in activities that seek to further, assist or help effectuate the goals of the enterprise." *State v. Ball*, 661 A.2d 251, 268 (N.J. 1995); *see also Mayo, Lynch & Assocs., Inc. v. Pollack*, 799 A.2d 12, 18 (N.J. Super. Ct. App. Div. 2002) (*quoting State v. Ball*, 661 A.2d at 268).

Given NJ RICO's broader definition of participation, summary judgment would be inappropriate on this Count.  Plaintiff has pointed to the following facts: (1) that Madison had provided the Power of Attorney and instructions on how to use it in connection with the closing; (2) that the deed was prepared by Pessy Herman, a closing coordinator for Madison; and (3) that material changes were made on the deed to the grantee's name and history of title after the deed was signed but before it was sent for recording.  (Pl.'s Br. in Opp'n 36–37) [116].  Although these facts may be consistent with Madison merely having served as a title agent, there remains a genuine issue of material fact as to whether Madison knew of and intended to further the Stanger Defendants' alleged enterprise.  Accordingly, we will deny summary judgment on the NJ RICO claim.

### 3.  Breach of Fiduciary Duty (Count V)

Plaintiff alleges that Madison assumed a fiduciary duty to Plaintiff and breached that duty by not discussing "which measures to take . . . in addressing the foreclosure," in "completing certain transactions involving the Subject Property," and by "divest[ing] Plaintiff's equity in his home . . . ."  (Second Am. Compl. ¶ 146–48.)  For reasons similar to those stated above with respect to the Stanger Defendants, the fiduciary breach claim must fail.

Plaintiff has not identified any New Jersey cases stating that a title agent owes a purchaser

of Property a fiduciary duty to advise him on transactions for which the agent issues a title

insurance policy.  It is unlikely any duty would exist in New Jersey considering that cases from

other districts have specifically found no duty under similar circumstances.  *See, e.g.*, *Contawe v.*

*Crescent Heights of Am., Inc.*, 2004 WL 2244538, at *5 (E.D. Pa. Oct 1, 2004) (stating that

"Pennsylvania does not, absent special or unusual facts, recognize a fiduciary relationship

between a title insurance agent and a purchaser of real estate").  Moreover, Plaintiff has not put

forth any evidence suggesting that he placed trust or confidence in Madison or that Madison was

in a superior position.  In fact, Plaintiff never interacted with Madison over the course of the sale-

leaseback's execution.  (Madison SUMF ¶ 37).  Thus, we will grant summary judgment for

Madison on the fiduciary breach claim.

### 4.  Civil Conspiracy (Count VIII)

Plaintiff alleges that Madison was engaged in a civil conspiracy with the other Defendants

regarding "the conduct described in Counts I through VI."  (Second Am. Compl. ¶ 161.)  Of those

counts, only the RICO, NJ RICO, and fiduciary duty claims include allegations against Madison.

A civil conspiracy is "a combination of two or more persons acting in concert to commit

an unlawful act or to commit a lawful act by unlawful means, the principal element of which is an

agreement between the parties to inflict a wrong or injury upon another, and an overt act that

results in damage."  *Banco Popular N. Am. v. Gandi*, 876 A.2d 253, 263 (N.J. 2005).  However,

the heart of a civil conspiracy claim is not the unlawful agreement but the underlying wrong.

*Morgan v. Union Cnty. Bd. of Chosen Freeholders,* 633 A.2d 985, 998 (N.J. Super. Ct. App. Div.

1993) (citing *Board of Ed. v. Hoek*, 183 A.2d 633, 646 (N.J. 1962)).

As stated above, the federal RICO and fiduciary duty claims against Madison must fail

and therefore cannot satisfy the requirement of an underlying overt act.  However, insofar as there

is a material factual dispute as to whether Defendant Madison knew of and intended to further the

Stanger enterprise in violation of NJ RICO, we find that there is also a genuine issue of material

fact as to whether there was an agreement to carry out NJ RICO violations.  Thus, we must deny

summary judgment on the civil conspiracy claim.

### 5.  Aiding and Abetting (Count VIII)

Plaintiff alleges that Madison "knowingly and substantially assisted in the conduct

[described in Counts I through VI] with a general awareness of [its] role[] in tortuous [sic] or

unlawful activity."  (Second Am. Compl. ¶ 161.)  Aiding and abetting liability requires a plaintiff

to show that (1) the party aided by the defendant performed a wrongful act that caused an injury;

(2) the defendant was aware of his role as part of an illegal or tortious activity when he provided

the assistance; and (3) the defendant knowingly and substantially assisted the principal violation.

*See Tarr v. Ciasulli*, 853 A.2d 921, 929 (N.J. 2004) (citing *Hurley v. Atlantic City Police Dep't*,

174 F.3d 95, 127 (3d Cir. 1999)).  "A claim for aiding and abetting . . . requires proof of the

underlying tort."  *State ex rel. McCormac v. Qwest Commc'ns Int'l Inc.*, 904 A.2d 775, 784 (N.J.

Super. Ct. App. Div. 2006).

Here, the change made to the title history on the Szelc-Parkstone deed, (*see* Pl.'s Br. in

Opp'n 36), as well as the email from Stanger alerting Herman of a potential issue prior to her

recording the Parkstone-Gottesman transfer, (*see* Kelleher Certification Ex. GG), are sufficient to

raise a question of material fact as to whether Madison was aware of its role in the alleged fraud.

Furthermore, the substantiality of Madison's assistance is an issue of fact not appropriate for

disposition on summary judgment.  Thus, summary judgment is denied on the aiding and abetting

claim.

### 6.  Consumer Fraud Act ("CFA") (Count VII)

Plaintiff alleges that Madison violated the CFA by engaging in "unconscionable

commercial practices, deception, fraud, false pretense, false promises, misrepresentations, and/or

the knowing[] concealment, or omission of material facts." (Second Am. Compl. ¶ 157.) To state

a CFA claim, a plaintiff must show "(1) unlawful conduct by defendant; (2) an ascertainable loss

by plaintiff; and (3) a causal relationship between the unlawful conduct and the ascertainable

loss." *Bonnieview Homeowners Ass'n v. Woodmont Builders*, 655 F. Supp. 2d 473, 503 (D.N.J.

2010) (quoting *Bosland v. Warnock Dodge, Inc.*, 964 A.2d 741, 749 (2009)). There are three

categories of unlawful practices under the CFA: (1) affirmative acts, such as unconscionable

commercial practices, deception, fraud, false pretense or promises, and misrepresentation, (2)

knowing omissions, and (3) regulation violations. *Gennari v. Weichert Co. Realtors,* 691 A.2d

350, 365 (N.J. 1997). Where the unlawful affirmative act consists of an "unconscionable

commercial practice," the standard for unconscionability is a "lack of good faith, honesty in fact

and observance of fair dealing." *Cox,* 647 A.2d 454, 462 (N.J. 1994). Where the unlawful

practice is an omission, however, intent is an additional required element, and the plaintiff must

show the defendant acted knowingly. *Id.*; *Miller v. Am. Fam. Publs.,* 663 A.2d 643, 647 (N.J.

Super. Ct. App. Div. 1995).

       Here, there is a genuine issue of material fact as to whether Madison knew of the forgery

issue regarding the Szelc-Parkstone transfer at the time it recorded the Parkstone-Gottesman

transfer. Based on the email Madison employee Pessy Herman received from Stanger stating that

she should delay recording the Parkstone-Gottesman transfer, (*see* Kelleher Certification Ex.

GG.), a reasonable jury could infer that Madison was on notice of a dispute as to the ownership of

the Property, and that the decision to record the transfer reflected a lack of good faith, honesty,

and fair dealing. Accordingly, we will deny summary judgment on the CFA claim.

### 7. Unjust Enrichment (Count IX)

       Plaintiff alleges that Madison was unjustly enriched insofar as it "received ownership of

and/or a portion of the value of the equity in the Subject Property." (Second Am. Compl. ¶ 164.)

Plaintiff also asserts that Madison was unjustly enriched to the extent it "received payment and/or compensation relating to the Subject Property." (*Id.* ¶ 166.)

Unjust enrichment is an equitable remedy a court may apply where a defendant has received a benefit and retention of that benefit without payment to the plaintiff would be unjust. *VRG Corp. v. GKN Realty Corp.*, 641 A.2d 519, 526 (N.J. 1994); *see also DiCarlo v. St. Mary Hosp.*, 530 F.3d 255, 268 (3d Cir. 2008) (quotation and citation omitted).

As stated above with respect to the Stanger Defendants, material issues of fact remain as to whether Plaintiff's signature was actually forged. If the sale-leaseback transaction was void, then Madison may have been unjustly enriched to the extent of any benefit it received based on the void contract. Accordingly, we must deny summary judgment on the unjust enrichment claim.

### 8. Unconscionability (Count X)

As with the Stanger Defendants, Plaintiff alleges that Madison had enormous bargaining power and that the option price in the sale-leaseback was so high as to be unconscionable, (Second Am. Compl. ¶ 168–70.) However, Madison was not a party to the sale-leaseback agreement between the Szelcs and Parkstone, (*see* Madison Br. in Reply 18) [124], and therefore cannot be held accountable for any unconscionable terms in the agreement. Thus, we must grant the motion for summary judgment on the unconscionability claim with respect to Madison.

### 9. Negligence (Count XII)

Plaintiff alleges that Madison breached its duty to Plaintiff by failing to exercise due care in drafting, reviewing, and processing the paperwork for the Szelc-Parkstone transaction. (Second Am. Compl. ¶ 184.) We disagree. As stated above with respect to the Stanger Defendants, Plaintiff's signature was notarized and Madison owed no duty to Plaintiff to inquire further as to the validity of the signature. Additionally, to the extent that Plaintiff argues that Madison was negligent in modifying the chain of title on the deed, Madison rightly notes that

those modifications were not the proximate cause of Plaintiff's loss of equity in the Property resulting from the transfer of title. (*See* Madison Br. in Reply 20–22.) Thus, we will grant summary judgment in favor of Defendant Madison on the negligence claim.

### D.  Summary Judgment as to Defendant GMAC

None of the Counts listed in the Complaint appear to state any factual allegations with respect to GMAC's conduct.  GMAC argues that, because it was not involved in the February 7th sale-leaseback of the Property, there is no cause of action against it and therefore summary judgment must be granted.  (GMAC Br. in Supp. 16–17) [112].  Plaintiff appears to concede that he brought GMAC into this lawsuit only for the purpose of remedies—namely, to set aside the mortgage placed on the Property after Gottesman received title from Parkstone.  (*See, e.g.*, Compl. ¶ 136(a) (requesting the Court to "void[] the transfer of title to Gottesman and the mortgage held by GMAC")); (*see also* Pl.'s Br. in Opp'n 29) [116].

Although neither party argues that compulsory joinder should apply under Fed. R. Civ. P. 19, the Court finds *sua sponte* that our ability to "afford complete relief" would be hampered by GMAC's absence from this lawsuit.  Fed. R. Civ. P. 19(a)(1)(A).  Specifically, this Court would need to assert jurisdiction over GMAC to order it to either (a) extinguish all claims it has with respect to its mortgage on the Property, or (b) accept future mortgage payments from Plaintiff rather than Gottesman.  Either of these alternatives is possible given the facts in dispute.

The first alternative could result if the Court concludes that Plaintiff's signature was indeed forged and that the transfers of the Property to Parkstone and, subsequently, to Gottesman must be set aside.  GMAC asserts that it should be protected as a bona fide mortgagee with no knowledge of any fraud.  (*See* GMAC Br. in Supp. 21) [112].  Under New Jersey law, conveyances are not void as to persons "not having, at the time of such conveyance . . . notice or knowledge of the covin, fraud or collusion" and, likewise, "no mortgage, made bona fide and

without fraud or covin, and upon good consideration, shall be impeached . . . ."  N.J.S.A. 25:2-5.

However, the long-established rule in New Jersey is that "[a] forgery can pass no rights, even to a

bona fide purchaser."  *Putnam v. Clark*, 35 N.J. Eq. 145, 1882 WL 8294, at *2 (Err. & App. 1882);

*see also U.S. v. Guaranty Trust Co. of N.Y.*, 293 U.S. 340, 345 (1934) (stating that "a subsequent

bona fide holder for value without notice of the forgery would acquire neither title to the

instrument nor the right to enforce payment").  Accordingly, if we were to find forgery, we could

extinguish GMAC's mortgage on the Property regardless of whether GMAC was a bona fide

mortgagee.

   The second alternative could occur if, regardless of the forgery inquiry, the Court chooses

to equitably subrogate GMAC to the position of the previous mortgages.  Under the doctrine of

equitable subrogation, "[a] mortgagee who accepts a mortgage whose proceeds are used to pay off

an older mortgage is equitably subrogated to the extent of the loan so long as the new mortgagee

lacks knowledge of the other encumbrances."  *U.S. Bank Nat'l Ass'n v. Hylton*, 959 A.2d 1239,

1243 (N.J. Super. Ct. Ch. Div. 2008).  Subrogation operates such that the "new lender will be

deemed to be substituted into the position of the prior mortgage holder by equitable assignment of

the prior mortgage . . . ."  *UPS Capital Bus. Credit v. Abbey*, 975 A.2d 548, 552 (N.J. Super. Ct.

Ch. Div. 2009).  A court applying this doctrine must find, in addition to the new lender's lack of

knowledge of the preexisting encumbrance, either that "(1) the old mortgagee was unjustly

enriched; or (2) the old mortgagee acted fraudulently."  *First Union Nat'l Bank v. Nelkin*, 808

A.2d 856, 861 (N.J. Super. Ct. App. Div. 2002) (citing *Metrobank for Sav., FSB v. Nat'l Cmty.

Bank*, 620 A.2d 433, 438–39 (N.J. Super. Ct. App. Div. 1993)).  The typical equitable

subordination case arises where a new lender pays off a first mortgage and is unaware of the

existence of a second mortgage; under equitable subordination, the new lender will be granted

priority over the second mortgage.  *See, e.g.*, *Hylton*, 959 A.2d at 1242.  We note that the facts

here are more complicated than the typical case, in that GMAC did not directly pay off the previous mortgages and is instead the successor to a new mortgage securing a loan that Gottesman obtained in order to recoup the funds he had invested in Parkstone's purchase of the Property.  However, it may be that, as a matter of equity, Plaintiff would be unjustly enriched if allowed to benefit from the payoff of its previous mortgages while retaining possession of the Property.  Accordingly, we may ultimately choose to apply equitable subrogation, such that the GMAC mortgage would remain on the Property.

Because either of these outcomes would require GMAC to remain a party in this action, we decline to grant summary judgment as to GMAC.

## IV. CONCLUSION

For the reasons stated above, and for good cause shown,

IT IS on this 15th day of April, 2011,

ORDERED that the Stanger Defendants' Motion for Summary Judgment [docket # 111] is GRANTED in part and DENIED in part; and it is

ORDERED that the Stanger Defendants' Motion for Summary Judgment is GRANTED as to Counts V, X, and XII; and it is

ORDERED that the Stanger Defendants' Motion for Summary Judgment is DENIED as to all other Counts; and it is

ORDERED that Defendant GMAC's Motion for Summary Judgment [docket # 112] is DENIED; and it is

ORDERED that Defendant Madison Title Agency's Motion for Summary Judgment [docket # 113] is GRANTED in part and DENIED in part; and it is

ORDERED that Defendant Madison Title Agency's Motion for Summary Judgment is GRANTED as to Counts I, V, X, and XII; and it is

ORDERED that Defendant Madison Title Agency's Motion for Summary Judgment is DENIED as to all other Counts.


  */s/ Anne E. Thompson*
ANNE E. THOMPSON, U.S.D.J.

-24-